22    86
24    129
24    450

22    86
12a    130
12a    135

22    86
28    200
28    202
o28    272

22    86
f36    215

## PARKS, AUDITOR, v. THE COMMISSIONERS OF THE SOLDIERS' AND SAILORS' HOME.

## PARKS, AUDITOR, v. THE PEOPLE EX REL. LEE.

1. CONSTITUTIONAL LAW—EXCESSIVE APPROPRIATIONS.

The general assembly is inhibited from making appropriations or authorizing expenditures in time of peace in excess of the revenue applicable to such appropriations. If acts are passed attempting to authorize such expenditures, they are void.

2. SAME.

No state officer can legally recognize legislation making appropriations beyond the limit fixed by the constitution.

3. APPROPRIATIONS—PREFERENCE.

In the event of a deficiency of revenue to meet appropriations, the necessary expenses of the executive, legislative and judicial departments of state, and interest on the public debt, are entitled to preference.

4. SAME.

The precedence of appropriations, when some have been made in excess of the revenue, is, after preferred appropriations have been discharged, according to priority of date of the taking effect of the acts making them.

5. CONSTRUCTION.

The maxim " expressio unius est exclusio alterius " is not of universal application. When there is reason for mentioning one thing and not the other, the absence of mention of the latter will not be considered as an exclusion.

6. PUBLIC OFFICER DEFINED.

Every officer of this state who holds his position by election or appointment, and not by contract, whose duties are defined by law, and are in their nature continuous, and relate to the administration of the affairs of state, and whose salary is paid out of the public funds, is a public officer, of either the legislative, executive or judicial departments.

7. SALARIES, HOW APPROPRIATED.

An appropriation for the payment of the salary of every public officer of the state may be included in the general appropriation bill; but the priority of a particular appropriation therefor will not be jeopardized if made by a separate act.

8. ORDINARY EXPENSES, WHAT MAY BE INCLUDED IN.

The expenses of keeping offices, records, papers, etc., and like items of public officers may be provided for in the general appropriation bill as part of the ordinary expenses of the different departments of the government.

9. APPROPRIATIONS—PREFERENCE.

In the absence of a legislative preference, appropriations for the state educational, reformatory or penal institutions have, in case of a deficiency of the revenue, no precedence over other appropriations.

10. ACT CONSTRUED.

The act of 1895, making an appropriation for the State Normal School, authorized the extension of a tax upon the tax rolls for the year 1895, the revenue thus created to be used for the year 1896.

11. AUDITOR OF STATE—WARRANTS.

The fact that the auditor of state has issued warrants upon an appropriation which, by reason of a deficiency of the revenue, was not entitled to payment, does not justify a refusal to draw a warrant upon another appropriation which is entitled to payment.

*Error to the District Court of Arapahoe County.*

THE revenues of the state for the fiscal year A. D. 1895, not being sufficient to meet all the appropriations made by the legislature for that year, the auditor refused to issue warrants for a part of the appropriation for the Soldiers' and Sailors' Home, and also refused to issue warrants for a part of the salary and expenses of the commissioner of mines and his assistants. Actions were accordingly commenced to compel the auditor by mandamus to issue warrants for the residue of these appropriations.

It is averred in the answers of the auditor, and not denied, that the appropriations for the fiscal year 1895 were largely in excess of the revenues available to meet the same. The answers, in addition to setting up the revenues for the year as estimated, set up a list of claimants for the revenue remaining undisposed of, and asked that such claimants be made parties to the action, in order that a multiplicity of suits may be avoided. The prayer of the petitioner in this behalf having been granted, the various claimants appeared and without objection submitted their claims to the residue of the revenues in question. As a result of the hearing in the district court, a peremptory writ of mandamus was ordered in favor of the commissioners of the Soldiers' and Sailors' Home, requiring the auditor to issue warrants upon the treasurer for the balance of the appropriation for that institution for the year 1895.

In the case of the commissioner of mines the writ was also allowed. The auditor brings both cases here upon error. The following provisions of our constitution are referred to in the opinion of the court:

Article III., sec. 1. " The powers of the government of this state are divided into three distinct departments—the legislative, executive and judicial—and no person, or collection of persons, charged with the exercise of powers properly belonging to one of these departments shall exercise any power properly belonging to either of the others except as in this constitution expressly directed or permitted."

Article IV., sec. 1. " The executive department shall consist of a governor, lieutenant-governor, secretary of state, auditor of state, state treasurer, attorney general, and superintendent of public instruction, * * *."

Article V., sec. 32. " The general appropriation bill shall embrace nothing but appropriations for the ordinary expenses of the executive, legislative and judicial departments of the state, interest on the public debt, and for public schools. All other appropriations shall be made by separate bills, each embracing but one subject."

Article VIII., sec. 1. " Educational, reformatory and penal institutions, and those for the benefit of the insane, blind, deaf and mute, and such other institutions as the public good may require, shall be established and supported by the state, in such manner as may be prescribed by law."

Article X., sec. 2. " The general assembly shall provide by law for an annual tax, sufficient, with other resources, to defray the estimated expenses of the state government for each fiscal year."

Article X., sec. 11. " The rate of taxation on property, for state purposes, shall never exceed four mills on each dollar of valuation."

Article X., sec. 16. " No appropriation shall be made nor any expenditure authorized by the general assembly whereby the expenditure of the state during any fiscal year shall exceed the total tax then provided for by law and ap-

plicable for such appropriation or expenditure unless the general assembly making such appropriation shall provide for levying a sufficient tax not exceeding the rates allowed in section eleven of this article to pay such appropriation or expenditure within such fiscal year. This provision shall not apply to appropriations or expenditures to suppress insurrection, defend the state, or assist in defending the United States in time of war."

Article XVI., sec. 1. "There shall be established and maintained the office of commissioner of mines, the duties and salaries of which shall be prescribed by law. When said office shall be established, the governor shall, with the advice and consent of the senate, appoint thereto a person known to be competent, whose term of office shall be four years."

The Attorney General and Mr. F. P. Secor, of counsel, for the Auditor of State.

Mr. D. V. Burns, for the Soldiers' and Sailors' Home.

Mr. Charles Hartzell, for the State Board of Health.

Mr. Harvey Riddell, for the School of Mines.

Mr. H. B. Babb, for the Home of Dependent Children.

Messrs. Kinkaid, Eddy & Hart, for the Commissioner of Mines and for the State Game and Fish Warden.

Mr. J. W. McCreery and Mr. C. D. Todd, for the State Normal School.

Mr. J. K. Goudy, for the School for the Deaf and Blind.

Messrs. Giffin & Murfree and Mr. Hugh Butler, for the State University.

Messrs. Robinson & Love, for the Agricultural College.

Mr. H. T. Sale, *amicus curiæ*.

Chief Justice Hayt delivered the opinion of the court.

These cases, having been consolidated for the purpose of the argument, will be considered together. They are a part of the crop of litigation which springs from the custom of the legislature, at each biennial session, to appropriate money in excess of the revenues of the state, in violation of express constitutional mandates, leaving the various claimants to contest in the courts their rights to the actual revenue.

This practice on the part of the lawmaking power has led to expensive and vexatious litigation, to the impairment of the credit of the state, resulting not infrequently in the deprivation of some of our most deserving institutions of funds absolutely necessary for their successful operation. To the credit of the legislature, be it said, however, that such unconstitutional appropriations have gradually decreased in amount during the six years that have elapsed since the first opinion of this court was rendered upon the subject, which is entitled *In re Appropriations*, 13 Colo. 316.

The seventh general assembly, which convened shortly prior to the rendition of that opinion, appropriated seven hundred and fifty thousand dollars ($750,000) for the years 1889 and 1890 in excess of the estimated revenues of the state for those years, and for this reason in violation of the constitution, while the appropriations made by the tenth general assembly only exceeded the revenue for the year 1895 by about seventy-five thousand dollars ($75,000). Justice to the legislative department requires the further statement that the deficiency for the year 1895 arose from a falling off in the revenues of that year, not anticipated at the time of the legislative session.

Questions growing out of appropriations beyond the constitutional limit have of late years received the careful attention of the courts. As a result of the cases that have reached this court for determination, certain principles of constitu-

tional law have been promulgated which aid materially in the determination of the present controversies. As to those principles we shall content ourselves with their brief statement, and, for the benefit of those who care to investigate the reasons for the conclusions reached, we shall refer to the reports where the cases may be found.

The leading opinion in this state in reference to the subject was written in the case in 13 Colo. already referred to. In that case it was determined, *inter alia*, that the general assembly is inhibited by the constitution from making appropriations or authorizing expenditures in time of peace in excess of the revenue applicable for such appropriations, and that if acts are passed attempting to authorize such expenditures, such acts are void and of no effect. It was further held that no state officer could in any way legally approve or recognize legislation making appropriations beyond the limit fixed by the constitution. And what is of special importance in this case, it was also held that in the event of deficiency of revenue to meet the appropriations, the necessary expenses of the executive, legislative and judicial departments of the state, and interest on any public debt, were entitled to preference. These principles have been followed and approved in a number of cases. *Henderson v. The People*, 17 Colo. 587; *Institute v. Henderson*, 18 Colo. 98; *Goodykoontz v. The People*, 20 Colo. 374.

It has also been determined that where appropriations are made in excess of the revenue, priority of date of the taking effect of the acts making such appropriations must govern after preferred appropriations are discharged. Within constitutional limits the general assembly may appropriate the public funds of the state as it chooses, but when it has once reached the limit, further appropriations are of no force and effect, for the reason that there is no revenue available to meet such appropriations. *Goodykoontz v. The People, supra; The People v. Board of Equalization*, 20 Colo. 220.

As some of the opinions to which reference has been made were delivered in answer to questions propounded by the

executive, it is perhaps well to say, in passing, that it must not be assumed for this reason that full argument was not heard by the court, or that the opinions were pronounced except upon the most careful consideration. The answer to the questions propounded by the governor *In re Appropriations, supra*, as we have already stated, involved the striking off of excessive appropriations to the amount of seven hundred and fifty thousand dollars ($750,000). To this extent the decision set aside, as unconstitutional, solemn acts of a coördinate department of the state government.

This court has frequently given expression to the reluctance with which, in the discharge of its sworn duty, it approaches the consideration of questions affecting the constitutionality of any act of the legislative department. To examine such questions with the utmost care and circumspection, and to be diligent in upholding all legislation which is not shown to be unconstitutional beyond all reasonable doubt, is required by a rule founded upon the soundest considerations of public policy, and universally recognized and approved.

The issues presented by the governor's questions *In re Appropriations* involved the constitutionality of many acts of the legislature. This legislation covered a wide field and affected vast and varied interests, while many of the statutes were of conceded merit. In view of these circumstances, it was not possible for the court to overlook the gravity of the situation. No cause which has been determined by this court in recent years has received more serious consideration than did the examination of those interrogatories propounded by the executive.

The conclusions announced in the other cases cited are but little more than the application of the principles promulgated in the case in 13 Colo. to new and peculiar facts. These cases are not only *stare decisis*, but the legislature having them in view at the time of making the appropriations now in question, furnishes an additional reason against a departure in the present controversy from the principles heretofore

announced. Accepting, therefore, these principles not only as the law of the state, but as the adjudged law of these cases, we shall pass to the new questions presented in this case. These may be summarized as follows:

*First.* What officers belong to the executive department, and as such have preferred claims against the state?

*Second.* The inmates of the penitentiary, insane asylum and similar institutions being confined involuntarily, does this circumstance give such institutions a preference to funds over other institutions, resort to which is voluntary on the part of the inmates?

*Third.* Did the act of 1895, making an appropriation for the State Normal School, and requiring the state board of equalization to levy a tax of one sixth ($\frac{1}{6}$) of a mill annually for the support of such institution, authorize that board to extend such special mill levy upon the assessment for the year 1895?

We shall address ourselves to the consideration of the foregoing questions in the order in which they are stated. The solution of the first is particularly important in this case, by reason of the constitutional provision to the effect that the general appropriation bill shall embrace nothing but appropriations for the ordinary expenses of the legislative, executive and judicial departments of the state, interest on the public debt, and for public schools; the argument upon this provision advanced by counsel for the Soldiers' and Sailors' Home being that appropriations for certain public officers to be found in the general appropriation act are void for the reason that such officers and their assistants are not a part of either of the three departments mentioned, and therefore the money so attempted to be appropriated was not in fact appropriated, and should be used to meet other appropriations constitutionally made.

As to what officers constitute the executive department of the state is a question somewhat difficult of solution. Article III. of our constitution, which has its counterpart in the constitution of every state in the Union, divides the powers

of the state government into three distinct departments, the legislative, executive and judicial. It is admitted that were this provision standing alone, the classification made must be held to include all public officers of the state, without regard to their rank or duties. And as the officers composing the legislative and judicial departments are well understood not to include the warden of the penitentiary, or of the reformatory, the commissioner of mines, or of insurance and the like, these must of necessity be classed as executive officers, unless some other provision of the constitution changes or modifies the effect of the language of article III. Upon the theory that the mention of some necessarily implies the exclusion of all others, such modification or change is sought in the following, from section 1, article IV.:

"The executive department shall consist of a governor, lieutenant-governor, secretary of state, auditor of state, state treasurer, attorney general, and superintendent of public instruction." * * *

The maxim "*expressio unius est exclusio alterius*" is not, however, of universal application. It has its exceptions, one of which is that when there is reason for mentioning one thing and not the other, the absence of any mention of the latter will not be considered as an exclusion. Sedgwick on Statutory Construction, page 31; Sutherland on Statutory Construction, sec. 329.

In declaring what officers should constitute the executive department of the state, it was not intended that the legislature should not create new executive officers. Such a presumption would do violence to the intelligence of the framers of that instrument, and of the people who adopted it. It is, we think, the purpose of this section to provide for such officers of the executive department as the members of the constitutional convention deemed absolutely indispensable; leaving it to the legislature to create new offices as the growth of the state and experience might suggest, and to abolish the same, but without authority to abolish any of those enumerated. The constitution of the United States provides that

the executive power of the nation shall be vested in the president, but it will certainly not be contended that it was intended by this that the president should be the sole and exclusive executive officer of the nation.

A provision of the constitution of the state of Washington is identically the same as section 1 of article IV. of our constitution, which reads: " The executive department shall consist," etc. The provision came before the supreme court of Washington for construction in the case of the *State v. Womack*, 4 Wash. Rep. 19. That was a case founded upon a statute making it a criminal offense for any person to bribe or attempt to bribe certain designated officers or " any executive, judicial or ministerial officer." Leach and others were members of the state board of education, and the defendant was charged with attempting to influence by bribery the vote of Leach with reference to certain text-books to be used in the common schools of that state. Leach not holding an office specifically mentioned in the statute, it was sought to include him within its provisions as an executive officer. The indictment was demurred to for the reason, among others, that Leach was not a member of the executive department of the state. This demurrer was sustained in the lower court, but the supreme court, in reversing the judgment, held that the constitution provided for three departments of the government, the executive, judicial and legislative, and that when a state officer is appointed or elected, he must necessarily belong to one of these departments.

The same provision of the constitution upon which reliance is here placed to show that certain officers are not members of the executive department was relied upon in that case, and as to it the court says:

" The language of the section is mandatory. It says ' the executive department shall consist,' etc. If the contention of the respondents is correct, that the intention of the section was to limit the executive officers of the state, their further position that the legislature can by subsequent enactment increase those officers, is untenable, for the essence

of a constitutional provision is its limitation on the power of the legislature, and when the constitutional provision is exclusive in its nature, it is supreme, and it is not within the power of the legislature to vacate or alter it. Hence their main contention would force us to the absurd conclusion that the constitution perpetually limits the executive officers of the state to the officers mentioned in said section. No known rule of construction will justify such a conclusion in this case."

We shall not extend this opinion beyond the case presented, and for the purposes of this case it is sufficient to say that every officer of this state who holds his position by election or appointment, and not by contract, and whose duties are defined by statute, and are in their nature continuous, and relate to the administration of the affairs of the state government, and whose salary is paid out of the public funds, is a public officer of either the legislative, executive or judicial department of the government, and may in the discretion of the legislature properly have his salary included in the general appropriation bill, and have the appropriation therefor take rank accordingly, and as the priority attaches not to the form of the act making the appropriation, but to the office, the priority of a particular appropriation will not be jeopardized if made by a separate act. Moreover, as the officers established by the constitution and those created by authorized legislative authority are usually required to keep offices, records, papers, etc., it is evident that expenses for these and like items may also be provided for as a part of the ordinary expenses of the legislative, executive and judicial departments of the government.

Our conclusions upon this branch of the argument may be summarized as follows: That as to those offices not expressly enumerated in the constitution, the legislature has plenary power to create or abolish the same, subject to well known constitutional restrictions. It may, subject to such restrictions, increase or diminish the salaries of the incumbents, but while the offices are in existence, and the officers

are discharging their duties, appropriations made for their salaries or necessary expenses are entitled to take rank with the ordinary expenses of the state government.

The second question has reference to appropriations for institutions, like the state penitentiary, where the inmates are confined against their will. The claim advanced in behalf of such institutions is that their appropriations should take precedence over others without reference to the date thereof. This argument is based upon what is denominated "*ex necessitate rei;*" it being urged that the penitentiary, although established by statute, is expressly recognized by the constitution, and that the experience of all civilized governments has demonstrated the necessity for such an institution; that the punishment for many crimes is by confinement therein. Hence it is said to be the duty of the state to see that the inmates are properly fed and otherwise cared for, and that appropriations for this purpose constitute a preferred claim against the state.

It is claimed that this position finds some support in two opinions of this court. *In re Appropriations, supra,* it is said: "By section 16, article 10, of the constitution, appropriations and expenditures which may be made or authorized by the general assembly are of two general classes: *First,* ordinary, which include all kinds of appropriations and expenditures necessary and proper for the support of the government and its institutions in time of peace; *second,* extraordinary, or such as are necessary 'to suppress insurrection, defend the state, or assist in defending the United States in time of war.'" And in the case of *Goodykoontz v. The People,* at the relation of the Soldiers' and Sailors Home, *supra,* it is said: "The Soldiers' and Sailors' Home, established by an act of 1893, is a state institution, and it is entitled to be supported by the state the same as other state institutions, except that those institutions in which the inmates are involuntarily confined may be entitled to the preference in case the public revenues are not sufficient for all."

VOL. XXII—7

The word "institutions" in the first of these opinions is used in its enlarged sense, and even as so used it was only employed to designate for what purposes the appropriations might lawfully be made by the state, and the opinion does not warrant the conclusion that, in case of shortage, the appropriations for the state educational, reformatory or penal institutions are to have preference over other appropriations. The entire reasoning of the opinion is against such a conclusion.

So, also, too much stress has been put upon the language used in the case of *Goodykoontz v. The People.* It was apparent by the facts disclosed in that case that the scramble for public funds was becoming so fierce that unless such institutions could in some way be protected, the revenues of the state might be exhausted in advance of appropriations for the penitentiary, insane asylum, reform school, etc. However disastrous to the best interests of the state such a result might prove, we are now satisfied, upon mature deliberation and reflection, that this is a matter within the discretion of the legislature, and that such discretion is beyond control by the courts.

This conclusion necessarily results from the distinctive character and independence of each of the three departments of government; the power of the legislature over the revenues of the state being plenary, except as limited by constitutional provisions. We are therefore of the opinion that all arguments with reference to the necessities of the various state institutions, or as to the duty which the state owes to maintain its educational, penal, reformatory and other institutions, can have no weight with the judicial department, it being entirely beyond the province of the courts to revise legislative action in reference thereto.

Several of the state institutions have been provided for by special levies. These institutions were as a precautionary measure made parties to this action, and have entered their appearance here, but we do not see that these special levies are in any way involved in the present controversy, except

incidentally the levy for the State Normal School. The facts as to that levy are as follows: At the last session of the legislature the sum of twenty-nine thousand and five hundred dollars ($29,500) was appropriated for the maintenance and support of this school for the year 1895, this amount to be paid out of the fund accruing in the state treasury from the assessment and levy for 1894. The second section of the act provides that for the year 1896, and annually thereafter, a special tax of one sixth of a mill shall be collected for the support and maintenance of the school. If the second section is to be alone considered, there is some doubt as to when the tax is to be levied, but if construed in connection with other portions of the act, the legislative intention that the levy should be made upon the assessment for the year 1895 is plain. That it should be thus made is necessary, in order that the funds may become available for the support of the school for the fiscal year 1896, otherwise there would be no provision for the payment of the expenses for that year, a conclusion we cannot indulge, and we are therefore of the opinion that the tax was properly extended upon the tax rolls for the year 1895, the revenue thus created to be used " for the year 1896."

The general appropriation bill contains an item of seventy-five thousand dollars ($75,000) for the suppression of the insurrection at Cripple Creek, and an item of one hundred thousand dollars ($100,000) for casual deficiencies of the revenues for the years 1893 and 1894. As bonds have been issued and sold and the proceeds devoted to the payment of these items, they are in no way involved in the present controversy, and need not be further mentioned.

The court fully indorses all that has been so eloquently said by counsel with reference to the duty of the state to make proper appropriations for the Soldiers' and Sailors' Home, and to provide against the inmates thereof being turned out upon the world in their aged, infirm and helpless condition. At the same time, it must be remembered that it is beyond the power of the courts to validate an unconstitu-

tional appropriation from the public funds for this or any other purpose.

In the case of *Goodykoontz v. The People*, at the relation of this institution, reported in 20 Colo., 374, it was held that the appropriation for this home, then under consideration, being of an earlier date than many of the appropriations made at the last preceding legislative session, the residue of the appropriation should be paid. Applying the same rule of priority to the case at bar,—the appropriation for the fiscal year 1895 being subsequent in point of time to other appropriations, which more than consumed all the revenues of that year,—it is clear that the district court erred in granting a peremptory writ of mandamus against the auditor in favor of this institution. Moreover, the same result necessarily follows, if the language of the act of 1895 be alone considered, as the appropriation is only " to be paid out of any moneys in the treasury not otherwise appropriated." As all the revenues were at the time "otherwise appropriated," there was nothing remaining for the act to operate upon.

In the case of Harry A. Lee, mining commissioner, it appears that the office was created in pursuance of a constitutional mandate ; that when the incumbent was appointed he became by virtue of the constitution a member of one of the three departments of the government, and as such was entitled to have his salary, and those of his assistants, etc., paid by the state, as part of the expenses of such departments, without reference to the date at which the act took effect.

Among the institutions made parties to this proceeding is the Home for Dependent Children. This institution was established at the last session of the general assembly, as a result of a quickened public conscience upon the subject of the waifs of the state, a comprehensive understanding of the relation of the state to the child, and the demonstrated effect of such institutions in decreasing crime. It is urged, however, that the institution is too young to be entitled to much consideration until the demands of the older institutions are

fully met. Such an argument has no foundation in logic or reason. It is now an established institution of the state, and the appropriation for its support, although meager, is entitled to consideration as of the date of the taking effect of the act. It may be competent for the legislature to provide that, in case of deficiency, the public funds shall be prorated between claimants of the same grade, but certainly, in the absence of such legislation, the courts cannot require this to be done when the priority in time can be ascertained; consequently, in case of several appropriations of the same grade made by separate bills bearing the same date, and there are funds to pay part, but not sufficient for all, priority should be given as of the time of day of the taking effect of the several acts. *The People v. Clark*, 1 Cal. 406; *Brainard et al. v. Bushnell*, 11 Conn. 16.

And if the auditor, through inadvertence or otherwise, has issued warrants upon a later appropriation, this will afford no defense to an action brought by a party having the prior right. The auditor is not justified to act in these matters from caprice or to be governed by favoritism, but has a sworn legal duty to perform; hence, having issued warrants in full for nearly all of the appropriations for the year 1895, he cannot be permitted to refuse to do so for those of prior date upon the pretext that he was not required to issue any warrant in the absence of cash in the treasury to meet the same.

At the time the answers were filed the revenues of the state for the year 1895 were estimated by the auditor, but it is now conceded by counsel that subsequent events have demonstrated that such estimates were much too low, and as the first of these causes must be remanded for further proceedings, it is directed that the parties be allowed to amend their pleadings in that case, as they may be advised.

In the case of the mining commissioner, the judgment of the district court is affirmed. In the case instituted on behalf of the Soldiers' and Sailors' Home, the judgment of the lower court is reversed, and the cause remanded for further proceedings in accordance with this opinion.